IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ELIEZER CRUZ-APONTE, *et al.*, <br><br> **Plaintiffs**, <br><br> v. <br><br> CARIBBEAN PETROLEUM CORPORATION, *et al.*, <br><br> **Defendants.** | CIVIL NO. 09-2092 (FAB) |

**MEMORANDUM AND ORDER**

BESOSA, District Judge.

Before the Court are the parties' briefs regarding whether the Court has subject matter jurisdiction to hear and adjudicate the complaint filed by the Cape Bruny parties (collectively, "Cape Bruny") for exoneration from or limitation of liability in the current proceedings.

I.  **Procedural History**

This class action litigation arises out of an explosion that occurred on October 23, 2009 at the Gulf Oil Facility in Bayamon, Puerto Rico.  The most recent amended complaint was filed on January 7, 2010.  (Docket No. 81.)  The complaint identifies thirty-four defendants.  Id.  On August 13, 2010, defendants Caribbean Petroleum Corporation ("CPC") and Caribbean Petroleum Refining LP ("CPR") (jointly referred to as the "CAPECO defendants") notified this Court of their filing of a voluntary bankruptcy petition in the United States Bankruptcy Court for the

Civil No. 09-2092 (FAB)                                              2
_____

District of Delaware.  (Docket No. 494.)  The Court granted a motion to stay the proceedings against all parties to the litigation in light of the bankruptcy filing by the CAPECO defendants.  (Docket No. 533.)

   On May 31, 2011, Cape Bruny moved this Court for a partial lifting of the stay in order to allow the limitation of liability proceedings to go forward.  (Docket No. 583.)  Cape Bruny alleged that according to a stipulation in which the Cape Bruny and the debtors entered, which was approved by the bankruptcy court, this Court "would be free to take any action it considered appropriate to resolve the subject matter jurisdiction" question broached by a number of parties in this action.  (Docket No. 583 at 4-5.)  On June 3, 2011, the Court granted the motion, and modified the stay in order to allow this Court "to determine whether it has subject matter jurisdiction to hear and adjudicate the complaint filed by the Cape Bruny parties for exoneration from or limitation of liability" and "to consider and rule on the motion to dismiss filed by the Total Petroleum Corporation."  (Docket No. 585.)  The Court ordered all parties to file briefs on the issues to be considered. Id.

   On July 5, 2011, Cape Bruny filed a memorandum in law in support of this Court's admiralty jurisdiction.  (Docket No. 586.) The Claimants also filed a brief in support of this Court's jurisdiction.  (Docket No. 587.)  Total Petroleum Puerto Rico

Corporation ("TPPRC") filed a brief arguing that this Court lacks subject matter jurisdiction. (Docket No. 588.) Defendant Harbor Fuel Service, Inc. a/k/a Harbor Bunkering Corporation ("HBC") filed a motion joining TPPRC's brief regarding this Court's lack of subject matter jurisdiction. (Docket No. 589.) On July 6, 2011, Claimants filed another brief in support of this Court's jurisdiction. (Docket No. 590.) On July 7, 2011, Claimant RLI Insurance Company also filed a brief in support of the Court's jurisdiction. (Docket No. 591.)

On July 19, 2011, the Claimants filed a response in compliance with this Court's orders, adopting by reference the motion filed by Cape Bruny. (Docket No. 595.) Cape Bruny and TPPRC filed their replies on the same date. (Docket Nos. 596 & 597.) On July 26, 2011, Cape Bruny and TPPRC both filed sur-replies. (Docket Nos. 598 & 599.) The Court limits this motion to addressing whether or not federal admiralty jurisdiction exists.

**II. Factual Background**

The following facts are taken from the third amended class action complaint filed on January 7, 2010. (Docket No. 81.) On October 23, 2009, an explosion and fire occurred at the Gulf Oil Facility located in Bayamon, Puerto Rico. The explosion occurred during the cargo unloading process of 278,000 gallons of highly flammable fuel at the marine dock by the vessel M/T Cape Bruny. The complaint alleges that the M/T Cape Bruny pumped too much fuel

Civil No. 09-2092 (FAB)                                                  4

into the pipelines that connect the marine dock to the storage tanks in the oil facility. The Gulf Oil Facility's computer monitoring systems were faulty and the two employees working at the time of the explosion were not able to monitor the mechanical gauge attached to the storage tank. As a result of the overpumping of fuel and the lack of oversight of the operation, the storage tanks overflowed without detection, and the fuel vaporized and spread across the Gulf Oil Facility. Once the vaporized fuel found a source of ignition, an explosion resulted, affecting the oil facility and a large part of the metro San Juan area.

### III. Applicable Legal Analysis

The parties do not dispute that the applicable legal analysis turns on whether or not this Court has admiralty jurisdiction over this matter. Nor do the parties disagree on the applicable Supreme Court case law. The historical evolution of the Supreme Court's test for determining whether admiralty tort jurisdiction exists in federal courts warrants a short discussion. The traditional test for admiralty jurisdiction, pursuant to 28 U.S.C. § 1333, was simply based on locality - in other words, the test "asked only whether the tort occurred on navigable waters." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 531 (1995). In 1948, however, Congress enacted the Extension of Admiralty Jurisdiction Act, which extended admiralty jurisdiction "over 'all cases' where the injury was caused by a ship or other vessel on

navigable water, even if such injury occurred on land." Id. at 532.

There have been four major Supreme Court cases that have qualified the jurisdictional rule established by the Congressional act.  First, in Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, the Supreme Court held that the locality test "is not of itself sufficient" to confer admiralty tort jurisdiction - it is also required that "the wrong bear a significant relationship to traditional maritime activity."  409 U.S. 249, 267 (1st Cir. 1972) (finding that admiralty jurisdiction did not exist where the crash of an aircraft on navigable waters bore no significant relationship to a traditional maritime activity.)  Next, in Foremost Ins. Co. v. Richardson, the Supreme Court held that a collision involving two pleasure boats on navigable waters "properly states a claim within the admiralty jurisdiction of the federal courts" because "of the need for uniform rules governing navigation, the potential impact on maritime commerce when two vessels collide on navigable waters, and the uncertainty and confusion that would necessarily accompany a jurisdictional test tied to the commercial use of a given boat."  457 U.S. 668, 677 (1982) (finding that the negligent operation of a non-commercial vessel on navigable waters has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction in federal court.)  The third Supreme Court decision in our analysis, Sisson v. Ruby, dealt with a fire on a noncommercial

vessel at a marina that damaged neighboring vessels and the marina. The Sisson Court held that admiralty jurisdiction existed because (1) the "general character" of the incident was of the kind that could cause a "potential disruption to commercial maritime activity" and because (2) "the storage and maintenance of a boat at a marina on navigable waters has a substantial relationship to a 'traditional maritime activity'". 497 U.S. 358, 363-365 (1990).

    The fourth and final Supreme Court case in our inquiry, Jerome v. Grubart, Inc. v. Great Lakes Dredge & Dock Co., elucidated the admiralty jurisdiction test that we apply to this case. In Grubart, the Supreme Court found admiralty jurisdiction to exist where water from the Chicago River poured into a freight tunnel and flooded buildings in downtown Chicago. 513 U.S. 527 (1995). The court held that both parts of the "connection" test established by Sisson were satisfied: first, the incident, generally described "as damage by a vessel in navigable water to an underwater structure", was of the sort to have a "potentially disruptive impact on maritime commerce"; and second, the "general character of the activity giving rise to the incident [here, the repair or maintenance work on a navigable waterway performed by a vessel] shows a substantial relationship to traditional maritime activity." 513 U.S. 527, 539-540 (1995).

**IV. Discussion**

In light of the elucidated case law on the subject, the Court now addresses whether the facts of this case meet the Supreme Court test to invoke admiralty jurisdiction.

    **A.   Locality Test**

None of the parties appears to contest seriously the fact that the locality test is met.  See Docket No. 588 at 6 (TPPRC's motion claiming that "admiralty jurisdiction in this case is lacking . . . because the 'connection test' is not met.") Nonetheless, the Court briefly addresses the locality test.  As the Grubart court noted, "[a] court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." 513 U.S. at 534.  Here, the alleged tortious act is the negligent discharge of cargo (fuel) from a vessel (M/T Cape Bruny) to a storage facility.  The M/T Cape Bruny, a chemical/oil products tanker vessel (Docket No. 81 at 12), was docked in San Juan harbor, which is indisputably a navigable body of water.  If the M/T Cape Bruny caused the explosion, it must have done so by negligently discharging fuel into the pipelines that connected the marine dock to the storage tanks.  Thus, if the M/T Cape Bruny tanker vessel committed a tort, it would have done so while on navigable waters, satisfying the locality test.

   **B.   Connection Test**

   The parties dispute whether or not the facts of the case satisfy the "connection test" articulated in Grubart.  The Grubart Court interpreted the Sisson connection test to require that (1) "the incident has 'a potentially disruptive impact on maritime commerce,'" and (2) that "'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'"  513 U.S. at 534 (quoting Sisson, 497 U.S. at 363-365, n. 2).  Defendant TPPRC alleges that the incident, which it describes in general terms, is not "within a class of incidents that pose more than a fanciful risk of impact on maritime commerce."  (Docket No. 597 at 4.)  TPPRC is correct that the appropriate inquiry is not whether the incident did, in fact, cause disruption to maritime commerce, but instead, whether the "general features" of the incident were "likely to disrupt commercial activity."  Grubart, 513 U.S. at 538.  TPPRC's description of the incident as "an explosion that occurred at an in-land storage tank", however, is far too general.  (Docket No. 588 at 6.)  Alternatively, the Cape Bruny parties describe the incident as "the discharge of cargo from a vessel to shore." (Docket No. 596 at 3.)

   The Court finds that the "general features" of the incident - damage caused to an in-land facility during the discharge of fuel from a vessel to land - does indeed "satisfy the

requirement of potential disruption to commercial maritime activity." See Sisson, 497 U.S. at 363.  TPPRC maintains that the relevant inquiry for the Court is not "the *actual* effects the incident in question may have had on maritime commerce, but rather, on whether in such *general terms* the incident can be seen within a class of incidents that pose more than a fanciful risk of impact on maritime commerce."  (Docket No. 597 at 4 (emphasis original).) While TPPRC is correct that the Supreme Court's inquiries have indeed been based on the potential disruption on maritime commerce, this is not to say that the Court should ignore the actual effects the incident in question caused.  See Grubart, 513 U.S. at 539 (in finding that damage by a vessel to an underwater structure has a "potentially disruptive impact on maritime commerce", the Supreme Court also noted that "[a]s it actually turned out in this suit, damaging a structure beneath the riverbed could lead to a disruption in the water course itself . . . [and] could lead to restrictions on the navigational use of the waterway during required repairs.")  Indeed, Cape Bruny alleges, and defendants do not dispute, that "[t]he vessel was forced to stop its unloading operations when the storage tanks exploded" and that "[a]fter the fire the U.S. Coast Guard halted use of the Capeco marine terminal facility for several weeks, diverting gasoline supplies for Puerto Rico to ports on the South Coast of the Island."  (Docket No. 587 at 8; Docket No. 586 at 12 (emphasis original).)  The Court finds

Civil No. 09-2092 (FAB)                                                10

that the potential disruptive effect of an explosion allegedly caused by the offloading of fuel from a vessel to an onshore storage facility on maritime commerce is certainly more than a "fanciful risk", because the incident is likely to affect both the vessel's discharge operations and the ability of the marina to accommodate other vessels like it in the future.

Having satisfied the first prong of the "connection test", the Court now analyzes "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Grubart, 513 U.S. at 539. The activity at issue here, the discharge of cargo (fuel) from a vessel to land, is certainly "substantially related" to a traditional maritime activity. As Cape Bruny alleges, tanker vessels like the M/T Cape Bruny are regularly used to transport cargo like chemical/oil products in international commerce, and the safe and efficient off-loading of the cargo is a primary objective of the vessel's undertaking. See, e.g., Walker v. Pacific Maritime Assoc., No. C07-3100, 2008 WL 1734757, at *1 (N.D. Cal. Apr. 14, 2008) ("the unloading of cargo is substantially related to a traditional maritime activity."); Poret ex rel. Alyson, Seth Poret v. Louisiana Lift & Equipment, Inc., No. 02-3642, 2003 WL 1338726, at *2 (E.D.La. Mar. 12, 2003); Gross v. Tonomo Marine, No. 02-1317, 2004 WL 2093457, at *7 (W.D. Pa. May 25, 2004). For the reasons stated, the Court finds that the second prong of the "connection

Civil No. 09-2092 (FAB)                                                            11

test" has been satisfied.  Thus, this Court finds admiralty jurisdiction to exist.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** admiralty jurisdiction over the limitation of liability proceedings in the instant case.  Because a number of motions remain outstanding, the parties are directed to brief the Court, **no later than July 20, 2012,** on whether and how the remaining motions before the Court may be disposed of in view of this Opinion.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 21, 2012.

                                            s/ Francisco A. Besosa
                                            FRANCISCO A. BESOSA
                                            UNITED STATES DISTRICT JUDGE